IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BRIAN D.S., | CV 25–106–M–DWM |
| Plaintiff, | |
| v. | OPINION and ORDER |
| FRANK BISIGNANO, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits under Title II of the Social Security Act. 42 U.S.C. §§ 401–34. The Commissioner's denial of benefits is affirmed.

## BACKGROUND

In 2024, Plaintiff worked on a ranch doing "odd jobs," which included attending to senior horses, performing yard work, and functioning as a handyman. AR 43–46, 1635. Before that time, he worked primarily as an HVAC installer. AR 43– 44. On June 9, 2021, he filed an application for disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–34. AR 82, 231–37 (the "Act"). His claimed disability, beginning May 20, 2021, AR

1

312, was denied on November 1, 2021, AR 82–92, 116–20.  Upon reconsideration on August 4, 2022, his claim was denied again.  AR 93–115, 121–25.  On September 8, 2022, Plaintiff requested a hearing, AR 126, which took place on July 3, 2024, before Administrative Law Judge Brian J. Henry (the "ALJ"), AR 15, 37–81.  Plaintiff and vocational expert Donna Toogood testified at the hearing, AR 15, 39, 72–78, and he was represented by counsel, AR 15, 37, 39, 205.

On August 9, 2024, the ALJ issued a decision denying benefits.  AR 12–35.  At step one, the ALJ found the claimant met the Social Security Act's insured status requirements through December 31, 2026, and did not engage in substantial gainful activity since May 20, 2021.  AR 17.

At step two, the ALJ found the following severe impairments: lumbar degenerative disc disease, right shoulder bursitis, bilateral carpal tunnel syndrome, lateral epicondylitis of the right upper extremity, left shoulder arthroplasty, ascending aortic aneurysm, and bicuspid aortic valve.  AR 17.  As to the claimant's depression, post-traumatic stress disorder, and anxiety, the ALJ found only mild limitations and deemed the mental impairments nonsevere.  AR 18–20.

At step three, the ALJ concluded the claimant did not have an impairment that met or equaled a listed impairment.  AR 20.

At step four, the ALJ determined the claimant had the residual functioning capacity to perform "light work" as defined in 20 C.F.R. § 404.1567(b), meaning

the claimant:

> can never climb ladders, ropes and scaffolds; can occasionally climb ramps and stairs; can never reach overhead with the upper extremities; can occasionally reach laterally with the dominant right upper extremity; can occasionally finger and handle, bilaterally; can frequently kneel and crouch; can occasionally stoop; can never crawl; can tolerate occasional exposure to vibration, extreme cold and extreme heat; and can tolerate occasional exposure to hazards, such as unprotected heights and moving mechanical parts.

AR 21. The ALJ found that the claimant's "statements concerning the intensity, persistence[,] and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR 22. Specifically, the ALJ considered the claimant's reports that "his symptoms were improving" and that he was performing "various physical activities, including working vehicles, mowing[,] and yard work," and clinical notes corroborated his reporting. AR 23. While the claimant "continues to have some physical deficits" related to the pain in his shoulders, right elbow, wrists, back, and cardiac problems, the ALJ concluded "the medical record does not show that they are as limiting as he alleged." AR 22. As to the claimant's alleged mental impairments, the ALJ concluded that the record demonstrates "little to no limitations in the four mental functioning domains." AR 24.

The ALJ found persuasive the State agency psychological consultants' finding of only mild limitations because it was "generally consistent with the mostly normal mental findings and the claimant['s] ability to perform tasks and be

3

around individuals." AR 24. Similarly, the ALJ found the State agency medical consultants' light work determination persuasive because it was supported by the medical record, the claimant's subjective reports, and his course of treatment. AR 25.

The ALJ found unpersuasive the opinion of the claimant's Licensed Clinical Social Worker, Shanna Romero, because it lacked support and was inconsistent with his treatment and the mild to moderate findings in his reports and imaging. AR 25. The ALJ also found unpersuasive the opinions of the claimant's primary care physician, Ingrid Calle, and his orthopedist, Charles Sullivan, because they were unsupported and inconsistent with the medical record and the claimant's subjective reports. AR 25. The ALJ also considered the claimant's father's written statement about his limitations, finding it "generally consistent with the claimant's reports." AR 25–26.

Although the claimant could not perform his past work, AR 26, the ALJ found at step five that he could perform jobs existing in significant numbers in the national economy, AR 26–27. The ALJ determined that the claimant could work as a furniture rental clerk, school bus monitor, or investigator of dealer accounts. AR 27. Considering the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, the ALJ concluded he is not disabled. AR 26–27.

4

On September 26, 2024, the claimant appealed to the Social Security Administration Appeal Council, AR 228–30, and on June 6, 2025, his request for review was denied, AR 1–6. On July 15, 2025, the Plaintiff appealed that decision to this Court. (Doc. 1.) The Commissioner filed the Administrative Record on September 9, 2025, (Doc. 6), Plaintiff filed his opening brief on October 31, 2025, (Doc. 8), and the Commissioner responded on December 30, 2025, (Doc. 14).

## LEGAL STANDARD

Pursuant to 42 U.S.C. § 405(g), a court may set aside the Commissioner's denial of Social Security benefits if the findings of an ALJ are based on legal error or not supported by substantial evidence in the record. *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). "Substantial evidence means more than a mere scintilla, but less than a preponderance." *Id.* (internal quotation marks omitted). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal quotation marks omitted). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. *Reddick v. Chater*, 157 F.3d 715, 720–21 (9th Cir. 1998). And, even if an ALJ errs, the decision will be affirmed where such error is harmless; that is, if it is "inconsequential to the ultimate nondisability determination," or if "the agency's path may reasonably be discerned, even if the agency explains its

decision with less than ideal clarity." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (as amended) (internal quotation marks omitted).

A disability claimant bears the burden of proving that disability exists. 42 U.S.C. § 423(d)(5). Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or to last at least 12 continuous months. 42 U.S.C. § 423(d)(1)(A). A claimant is disabled only if his impairments are so severe that he cannot perform his previous work or, considering his age, education, and work experience, any other substantial gainful activity in the national economy. 42 U.S.C. § 423(d)(2)(A); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

In determining disability, the ALJ follows a five-step sequential evaluation process. *Tackett*, 180 F.3d at 1098; 20 C.F.R. § 404.1520(a)(4)(i)–(v). At steps one and two, the ALJ asks whether the claimant is engaged in substantial gainful activity and whether they have a severe impairment. *Kennedy v. Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013). If the analysis continues beyond step two, "the third step asks whether the claimant's impairment or combination of impairments meets or equals a listing under 20 C.F.R. pt. 404, subpt. P, app. 1 and meets the duration requirement." *Id.* If the analysis proceeds beyond step three, the ALJ considers the claimant's residual functional capacity at steps four and five to determine whether the claimant can perform past relevant work or adjust to other work. *Id.*

At step five, the burden shifts to the Commissioner. *Tackett*, 180 F.3d at 1098. If the claimant is found not disabled at any step, the analysis ends. *Id.*

## ANALYSIS

Plaintiff argues the ALJ committed the following errors: (1) the ALJ failed to correctly assess his mental and physical limitations in formulating his residual functional capacity; (2) the ALJ failed to correctly evaluate medical source opinions; (3) the ALJ failed to elicit adequate vocational expert testimony; and (4) the ALJ improperly rejected both Plaintiff's and his father's testimony. Because these arguments lack merit, the Commissioner's decision is affirmed.

## I.   Mental and Physical Limitations

Plaintiff argues the ALJ erred by finding his mental impairments "nonsevere," omitting related limitations at step four, and formulating a residual functional capacity assessment that omitted physical limitations and therefore was not supported by substantial evidence. These arguments are addressed in turn.

### A. Plaintiff's Mental Impairments

Plaintiff argues the ALJ erred by failing to find his mental impairments "severe" at step two, and, as a result, failing to include them in the step four finding. This argument is unpersuasive.

#### i.      Severity Determination

To determine whether a claimant's mental illness meets a listed impairment,

the ALJ applies a "special technique" that considers whether the diagnostic criteria in Paragraph A (the "A criteria") and functional criteria in Paragraphs B (the "B criteria") or C (the "C criteria") are satisfied. 20 C.F.R. § 404.1520a(a), (b), (c). Paragraph A addresses the presence of a mental disorder, App. 1 at § 12.00(A)(2)(a), while Paragraphs B and C address functional limitations incompatible with gainful activity, *Id.* § 12.00(A)(2)(b), (c). "[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521.

The ALJ found that the claimant had medically determinable impairments of depression, post-traumatic stress disorder, and anxiety. AR 18. The ALJ then considered his functional limitations. AR 18–20. An ALJ rates mental impairments in four areas of functioning, and the B criteria are satisfied only if the disorder causes one "extreme" limitation or two "marked" limitations. App. 1. at § 12.00(A)(2)(b). The four areas are: "[u]nderstand, remember or apply information; interact with others; concentrate, persist or maintain pace; and adapt or manage oneself." *Id.* "Extreme" means a claimant is "not able to function," while "marked" means that functioning is "seriously limited." *Id.* § 12.00(F). A "moderate" limitation means the claimant's functioning in that area is "fair." *Id.*

For the first functional area, the ALJ found no limitation. AR 18. The claimant indicated he can "do laundry, clean dishes, prepare simple meals, pay

bills, take medications, shop, and read." AR 18. He was also "able to provide information about his health, describe his prior work history, follow instructions from providers, comply with treatment, and respond to questions from providers" with an "intact memory during examinations." AR 18. For the second functional area, the ALJ found a mild limitation based on reported "irritability and social isolation." AR 19. The claimant "is able to get along with others, shop, spend time with friends and family, is respectful of authority figures, and [can] live with others." AR 19. He also "had good rapport with providers; was described as pleasant, talkative, and cooperative; had normal eye-contact, and had good interactions with medical staff." AR 19. For the third functional area, the ALJ found no limitation. AR 19. The claimant is "able to prepare simple meals, watch TV, read, and manage funds," and had "intact concentration" during examinations. AR 19. For the fourth functional area, the ALJ found a mild limitation. AR 19. The claimant is "able to handle self-care and personal hygiene with some difficulty, do laundry, care for his 94-year-old grandfather and a cat, and perform at[-]home physical therapy." AR 19.

After rating the functional limitations caused by the claimant's medically determinable mental impairments, the ALJ must assess their severity. 20 C.F.R. § 404.1520a(d); *Kennedy*, 738 F.3d at 1175. A severe impairment is a medically determinable physical or mental impairment that has lasted or is expected to last at

9

least twelve months, 20 C.F.R. § 404.1520(a)(4)(ii), and "significantly limits" the claimant's ability to perform basic work activities, *id.* § 404.1520(c). *See id.* § 404.1522(a). This requirement is a "de minimis screening device used to dispose of groundless claims." *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (internal quotation marks and alteration omitted). Because none of the claimant's mental impairments impose "more than a minimal limitation in [his] ability to do basic work activities," 20 C.F.R. § 404.1520a(d)(1); *see id.* § 404.1522, the ALJ concluded they are "nonsevere," AR 20.

Plaintiff argues the ALJ erred. He cites therapy sessions with Shanna Romero and meetings with his primary care physician, Ingrid Calle. However, because step two "is not meant to identify the impairments that should be taken into account when determining the residual functional capacity," *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017), any error in the severity finding is harmless if the ALJ proceeds beyond step two and considers the nonsevere mental impairments in assessing residual functional capacity, *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Both requirements are met here.

### ii. Mental Impairment Residual Functional Capacity

Plaintiff argues the ALJ failed to account for his mental impairments at step four. But that claim rests on the mistaken premise that step two findings of "mild,"

or even "severe," mental limitations compel corresponding mental restrictions at step four. They do not. Although the ALJ "must consider *all* allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess [residual functional capacity]," SSR 96-8P (emphasis added), the step four finding includes only those work-related functional limitations supported by the record, 20 C.F.R. § 404.1545(a)(2), (c). Thus, irrespective of the severity finding, the ALJ need not enumerate specific B criteria limitations in the residual functional capacity assessment unless the mental impairments impose work-related functional limitations. *Woods v. Kijakazi*, 32 F.4th 785, 794 (9th Cir. 2022).

Here, the ALJ acknowledged the claimant's mental impairments and assessed the functional impacts. AR 21, 24–26. The ALJ concluded that his "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR 22. Absent a showing that the ALJ's evaluation of symptoms or medical opinions lacked substantial evidence, Plaintiff cannot establish reversible error by pointing to the step two B criteria findings or arguing that the ALJ *should* have found his mental impairments "severe." *See Buck*, 869 F.3d at 1049 (explaining that residual functional capacity "should be exactly the same regardless of whether certain impairments are considered 'severe' or not").

11

Accordingly, Plaintiff's mental limitations claim fails.

**B. Physical Limitations in the Residual Functional Capacity Finding**

An ALJ must follow a two-step process in considering a claimant's symptoms. First, an ALJ must find a medically determinable physical or mental impairment, demonstrable by clinical or laboratory diagnostic techniques, reasonably expected to produce the claimant's symptoms. 20 C.F.R. § 404.1529; SSR 16-3p. Second, an ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to discern the degree of limitation imposed on work-related activities. *Id.*

The claimant has the following "severe" medically determinable physical impairments: (1) lumbar degenerative disc disease, (2) right shoulder bursitis, (3) history of left shoulder arthroplasty, (4) bilateral carpal tunnel syndrome status post release, (5) lateral epicondylitis of the right upper extremity, and (6) history of ascending aortic aneurysm and bicuspid aortic valve. AR 17–18. He alleges the following physical symptoms relating to those impairments:

(1) Sciatica and back problems make labor painful and carrying hard.
(2) Bilateral epicondylitis makes it difficult and painful to grab, hold, and move his right arm.
(3) Left reconstructive shoulder surgery makes movement of any kind impossible and painful.
(4) Ability to lift 10 to 20 pounds with his right arm and walk a half mile before a five-minute rest.
(5) Difficulty dressing, bathing, opening doors, washing dishes, slicing or chopping food, opening packages, or making the bed.
(6) Difficulty using both upper extremities; decades-long back issue;

12

shaky hands "all the time," inability to close fist; and heart symptoms.

(7) Ability to lift 20 pounds, walk or stand for 30 to 45 minutes, and sit for about 30 minutes.

AR 21. Step one is not a high bar because it does not "consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence." SSR 16-3p. The ALJ concluded that all of the claimant's medically determinable impairments met step one. AR 22.

On step two, the ALJ evaluated the intensity, persistence, and limiting effects of the symptoms to find the degree of limitation on the claimant's work-related activities. AR 22–26; 20 C.F.R. § 404.1529; SSR 16-3p. While an ALJ "must examine the entire case record," SSR 16-3p, they are not "required to believe every allegation of disabling pain" brought by the claimant, *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) (internal quotation marks omitted). So long as the ALJ provides "specific, clear, and convincing reasons supporting a finding that [a claimant's] limitations were not as severe as he claimed," *Ahearn v. Saul*, 988 F.3d 1111, 1117 (9th Cir. 2021); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *see* SSR 16-3p, a "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony," *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008).

Here, the ALJ found that the claimant's description of his alleged symptoms

13

was not "entirely consistent with the medical evidence and other evidence in the record," and that the "clinical notes do not show these impairments are as limiting as alleged." AR 22–26. Plaintiff argues the ALJ's "light work" determination does not "accurately encompass all exertional and non-exertional limitations that are supported by the record." (Doc. 8 at 13.) Plaintiff's physical limitations are addressed in turn.

### i.    Shoulders

According to Plaintiff, his first shoulder dislocation occurred in 2007, and it has likely recurred more than 100 times since then. AR 505, 511. When visiting Dr. Michael Wright in August 2021, he had "5 out of 5 supraspinatus infraspinatus and subscapularis strength," and no fractures, dislocations, or arthritis. AR 505–07. In September 2021, Plaintiff could "exert himself, go up and down a flight of stairs, be active without any symptoms." AR 511. He underwent left shoulder arthroscopy and SLAP repair surgery, which showed mild findings. AR 515–17.

Early follow-ups were also favorable. Dr. Wright reported that Plaintiff's shoulder "looks excellent," his pain was "well controlled," and he had no sensorimotor deficits or wound-healing problems. AR 513. In October 2021, conservative management documented "improved" symptoms. AR 626, 631, 633. Over the next couple of months, Plaintiff's surgical incisions healed, and his pain remained "relatively well controlled." AR 593, 624, 626. By December 2021, he

14

was exercising daily, including walking multiple miles, despite claiming he could not work because of chronic pain. AR 618–19.

In January 2022, Dr. Wright again reported "excellent" results, AR 642–43, and in February 2022, although Plaintiff's right shoulder began to bother him, the pain was not persistent. AR 605–08. By March 2022, he reported his left shoulder felt "back to normal." AR 655–56. This is consistent with the ALJ's finding that, seven months after surgery, the claimant's left shoulder was nearly normal, with restored range of motion and strength. AR 22.

As to his right shoulder, Plaintiff reported pain in March 2022 but denied any weakness. AR 655. Dr. Wright found "5 out of 5" strength, no fractures, dislocations, or arthritis, and assessed Plaintiff with symptoms "consistent with bursitis." AR 655–56. A later May 2022 exam found his right-shoulder range of motion "intact," while describing his left shoulder range of motion as "grossly limited." AR 786–87, 789.

June 2022 physical therapy records document improvement in symptoms and functional capacity. Plaintiff reported he was "able to do more," and the physical therapist noted his ability to "perform most daily activities," and upper extremity "strength increasing globally." AR 689–92, 694–98. This is consistent with the ALJ's recognition that June 2022 therapy demonstrated residual overhead issues but near-full strength and intact range of motion. AR 22. Plaintiff reported

pain at four out of ten with "slightly limited" difficulty in work and activities, and an Oswestry Disability Index Score ("Disability Score") rated at 32/100. AR 722, 728, 817.

By 2023, Plaintiff's physical therapy reports reflected increasing activity tolerance, supporting the ALJ's conclusion that the claimant's shoulders were improving and "fine." AR 22. In February 2023, Plaintiff noted working on his dad's truck, experiencing muscle fatigue, no pain, and symptom relief from therapy. AR 996–97, 1002, 1004–06. He also reported less pain while doing projects, including hammering, and "significant progress outside of clinic including being able to use power tools overhead for a cumulative of 3 h[ou]rs . . . ." AR 990–95. In May 2023, Plaintiff stated he helped "his grandfather and his father around their home with moving heavy objects, yard work," and completing "household chores such as dishes, looking after chickens, moving wood in for stove fires, and prepping dinner with little to no soreness in the forearm." AR 961. He also indicated his pain was zero to one out of ten, that he modified his activities at work, and had recently been on a ladder for several hours. AR 944–45, 961–63. In June 2023, physical therapy noted Plaintiff's report of "return[ing] to part of his usual work load in manual labor." AR 940–41, 1051–52. In July 2023, he reported no pain, that "activities [were] becoming easier at home and work," and that "[a]ll other areas of the body are feeling fine

including . . . shoulders." AR 1023–24, 1028–29. This dovetails with the ALJ's finding that the claimant's shoulders were "feeling fine." AR 22.

Because Plaintiff's shoulder symptoms and function improved with surgery and conservative care, and medical evidence demonstrates relatively benign symptoms, the ALJ's conclusion that Plaintiff's shoulder impairments are not as limiting as alleged is substantiated by the record.

### ii.    Right Elbow

The record also demonstrates that Plaintiff experienced similar improvement with his right elbow. His right elbow pain began in 2014 "from swinging a hammer" and flared up again in 2021. AR 480. In June 2021, he reported that he had taken two months off work, and that his elbow pain had healed before flaring again with "increased hammering," tool-use, and "working more than usual." AR 480. Plaintiff's physical therapist provided him with a brace, but he wore it too tightly, causing swelling and increased pain. AR 480. His physical therapist noted swelling, irritability with range of motion, and lateral epicondyle tenderness. AR 481. But the examination also documented improvement, stating he "demonstrates improved tolerance to elbow [range of motion], palpitation and muscle activation since last session." AR 481.

Although the June 2021 physical therapy records show right elbow symptoms, they also show improved tolerance and responsiveness to treatment.

17

AR 480–81, 483–84. This is consistent with the ALJ's finding that the claimant's right elbow impairment improved during June 2021 physical therapy. AR 22.

In August 2021, Plaintiff went to Missoula Bone & Joint reporting four months of right elbow pain and decreased range of motion, which he stated was affecting his construction work. AR 503. He explained that the pain occurred with lifting and elbow extension and flexion. AR 503. The medical report noted lateral epicondyle tenderness, "grossly intact" but painful range of motion in the right elbow, and a stable right elbow. AR 503. After the brace was repositioned, he reported improvement during that session. AR 504. The record supports the ALJ's finding that the claimant's right elbow impairment improved after his brace was repositioned in August 2021. AR 22, 503–04.

In February 2022, Plaintiff underwent right elbow surgery with no complications. AR 657. At a post-operative check-in, he stated he was "doing well," and his orthopedic surgeon reported he had "near full range of motion." AR 649. A March 2022 check-in showed a restricted range of motion, AR 651, but 14 days later, it expanded, and his elbow was "nontender." AR 653. The record substantiates the ALJ's finding that the claimant's right elbow surgery "healed well." AR 22, 508–10, 649, 651, 653, 657.

By May 2022, Plaintiff had a full range of motion, a nontender elbow, and his orthopedic surgeon noted that "he was doing well enough" to return as needed.

AR 784. On the same day, in an examination of an unrelated complaint, his right elbow range of motion was assessed as "grossly intact." AR 787. While he reported still having pain in his right elbow in December 2022, Plaintiff stated the specific pain he had prior to surgery was gone, and his surgeon indicated that he "may return to work as tolerated." AR 802. The record shows continued postsurgical improvement despite persisting symptoms.

In February 2023, Plaintiff complained of "residual pain in his dorsal forearm," describing it as "the *only* thing that is still bothering him about [his] elbow." AR 797 (emphasis added). That is consistent with the ALJ's finding that the claimant's elbow complaints narrowed to only residual discomfort, instead of an ongoing functional instability or major limitation. AR 22.

In July 2023, Plaintiff reported during physical therapy that "[a]ll other areas of the body are feeling fine including his . . . elbows . . . ." AR 1023. This is consistent with the ALJ's finding that the claimant reported his elbow was "feeling fine." AR 22.

Accordingly, the record shows an improvement trajectory for Plaintiff's right elbow that the ALJ reasonably based on substantial evidence.

### iii.    Wrists

Plaintiff's medical records also support the ALJ's conclusion that his wrist symptoms improved with conservative care and surgical treatment. AR 22–23. In

19

August 2021, he showed signs of nerve compression, the right wrist worse than the left. AR 509. Plaintiff was diagnosed with carpal tunnel syndrome based on "longstanding signs and symptoms" and no relief from braces or anti-inflammatory medication. AR 510.

In January 2022, nerve tests found "mild" irritation in both wrists consistent with carpal tunnel syndrome. AR 1299. In May 2022, he had steroid injections in both wrists. AR 789. In June 2022, Plaintiff's hand surgeon documented symptoms of tingling. AR 791. Treatment reflected that while Plaintiff was a candidate for carpal tunnel release, he was "still having good relief from steroid injection," and "may certainly wait until he has recurrence of symptoms" due to the symptomatic relief he was experiencing. AR 791. By September 2022, he reported his wrists were "very much improved," with a reduction in the "feeling of stiffness and tightness through all of his fingers." AR 807.

Plaintiff chose to have carpal tunnel release in both wrists, with the left wrist procedure occurring in October 2022. AR 792, 796, 804, 809. Post-operation, he reported his left hand was overall "feeling better," and a better tolerance of motion and activity. AR 804. Furthermore, the numbness and tingling previously reported, *see* AR 791, were "resolved," AR 804. Upon examination, his fingers were reported as "grossly neurovascularly intact," with a "grossly intact" range of motion in all areas of both hands. AR 804.

20

In January 2023, Plaintiff reported he was helping his grandfather and father move heavy objects and do yard work, and that he was able to "complete household chores such as dishes, looking after chickens, moving wood in for stove fires, and prepping dinner with little to no soreness in the forearm." AR 1014. In March 2023, he received right wrist carpal tunnel release, and post-operation records reflect that he was doing well. AR 793. An MRI found "mild" nerve changes with no "appreciable nerve enlargement" and "unremarkable" imaging. AR 1288. The report is consistent with the ALJ's description of only mild imaging findings post-treatment. April 2023 records show that Plaintiff had "improved function," "resolved" numbness and tingling, and no pain in his right wrist. AR 793. As was the case with his left side, AR 804, all examined areas were "grossly intact," full recovery was anticipated, and "no lifting restrictions" were imposed. AR 793–94.

By May 2023, Plaintiff had residual but improving sensitivity in his right palm and wrist. AR 959. In July 2023, he reported to physical therapy that "[a]ll other areas of the body are feeling fine including his wrists . . . ." AR 1023. This is consistent with the ALJ's finding that the claimant reported his wrists were "feeling fine." AR 22–23.

The record contains substantial evidence in support of the ALJ's finding that Plaintiff's wrist impairment is not as limiting as he claims.

21

iv.    **Back**

As to Plaintiff's back, medical records support the conclusion that symptoms improved with conservative care.  Imaging reflects degenerative but largely mild to moderate findings in his spine.  AR 1056–57.  A June 2022 MRI documented degenerative changes at several levels, primarily mild-to-moderate disc bulges and foraminal narrowing.  AR 669–70.  A July 2022 cervical spine MRI showed small disc bulges and mild foraminal narrowing with no spinal cord abnormality.  AR 1056–57.  A May 2023 lumbar spine MRI described the aforementioned degenerative findings as otherwise stable compared to the June 2022 MRI.  AR 1286–87.

Plaintiff's physical therapists conservatively managed his back with osteopathic manipulation and therapy.  AR 709–10, 970–71, 976.  In June 2022, he was advised "no heavy lifting, no bending, no twisting," and prescribed pain medications.  AR 739–40.  Physical therapy records show treatment for pain and generalized weakness starting in 2022.  AR 706–08, 927–28.  Plaintiff's physical therapy notes from mid-2022 document increasing tolerance to activity, with "pain frequency, duration and intensity . . . reducing as he improves in his movement patterns reducing loads to sensitive structures and allowing those areas to heal without aggravation."  AR 915, 926.  In August and September 2022, he reported to physical therapy that his back felt good and the pain was "not bad at all."  AR

22

879–90, 892–99, 915.  Even when Plaintiff experienced symptom flares with activity, the record reflects overall improvement when modifying his activity.  AR 879–84, 888, 890, 892–93, 896, 899.

By the fall of 2022, Plaintiff's physical therapy reports recorded "significant progress."  AR 833–37, 846–63, 866–67, 875–78.  In October 2022, his Disability Score was 34 percent with pain at a four out of ten, while several months earlier his Disability Score was 42 percent with pain at a nine out of ten.  *Compare* AR 876 *with* AR 907–08.  In December 2022, physical therapy reports continued to describe his functional gains as consistent with improvement.  AR 828–30.

Plaintiff's 2023 physical therapy records demonstrate continued benefits reported in his engagement in activities consistent with improved back function.  In February 2023, he reported "push[ing] a couch up stairs and fe[eling] like his back started tightening up and hurting on the right side."  AR 1000.  In March 2023, he noted that "other than the flare up when moving the couch this past month[, his back] has been in overall better shape than it was a year ago," and reported a pain level of two out of ten.  AR 974.  In April 2023, Plaintiff reported five out of ten pain in his lower left back, but admitted the pain resulted from being "up on a ladder" a few days prior.  AR 968.  In his next physical therapy session, he rated his back pain one out of ten.  AR 966.

June 2023 medical and physical therapy records reflect low pain ratings and

23

increasing activity tolerance. AR 936–41, 1063. Plaintiff denied any increase in symptoms, AR 937, rated his pain at one out of ten, AR 1063, and, by late June 2023, reported that he could "return to part of his usual work load in manual labor," AR 1052. This improvement is reflected in his Disability Score of 26 percent. *Compare* AR 1054 *with* AR 876 *and* AR 907–08.

By late summer 2023, Plaintiff reported minimal pain and meaningful symptomatic relief. AR 1023, 1100, 1271. In July 2023, he noted that after receiving sacroiliac joint injections, his pain was zero out of ten. AR 1023, 1100. In August 2023, he reported he was "pleased overall with the results." AR 1271.

The medical findings, therapeutic gains, and reported functional activities constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's back impairment is not as limiting as he claims.

### v.    Heart

As to Plaintiff's heart, the record shows a similar progression of improvement. Plaintiff has a nonsevere bicuspid aortic valve, occasional extra heartbeats, a dilated left ventricle with "mildly reduced systolic function," and an ascending thoracic aortic aneurysm. AR 433–35, 1308, 1352, 1359. The record shows conservative management. AR 433–35, 1289–91, 1305–06, 1310–11. He was reported clinically asymptomatic, and his doctor stated that his issues are "driven largely by his underlying untreated anxiety." AR 511, 1266–67, 1359. In

24

March 2020, Plaintiff reported "chest pressure and palpitations that he's had since childhood." AR 1359. The resulting treatment plan was conservative with follow-up surveillance. AR 1359.

Cardiac testing in 2020 continued to show mild to moderate abnormalities. AR 433, 1351–52. An August 2020 echocardiogram confirmed a bicuspid aortic valve with "mild to moderate" aortic regurgitation and a 4.2 centimeters ascending aorta. AR 1353. A September 2020 MRI documented a similar ascending aortic dimension of 4.3 centimeters, mild dilation, and "mildly reduced systolic function" of the left ventricle. AR 1351–52. The same MRI report also characterized Plaintiff's ascending aorta as "low risk for complication." AR 1352. A September 2020 visit similarly assessed a "mildly dilated left ventricle" and noted Plaintiff's ascending aortic aneurysm increased by 2 millimeters in diameter over six months, documenting the need for a thoracic surgery referral. AR 433.

However, in May 2021, an MRI measured the ascending aorta at 4.3 centimeters, citing "no definite change." AR 1310–11. A November 2021 echocardiogram likewise documented dilation at 4.3 centimeters and cited the 0.1-centimeter reduction from the 4.4-centimeter diameter in March 2021. AR 1308. In a November 2021 cardiology follow-up, Plaintiff's cardiologist characterized the aneurysm as "essentially stable from prior studies." AR 1305. During an unrelated orthopedic visit, Plaintiff reported being "completely asymptomatic,"

25

and "able to exert himself, go up and down a flight of stairs, be very active without any symptoms." AR 511.

Surveillance findings of Plaintiff's heart from 2022 to 2024 continued to support cardiac stability and function. AR 1267, 1269, 1289, 1295. In September 2022, ascending aorta dilation was at 4.3 centimeters, and different from previous exams, he had a "[n]ormal left ventricular size and systolic function." AR 1295. During a September 2023 follow-up, the measurements were the same. AR 1269. And in January 2024, he stated he "has no cardiac complaints." AR 1267.

Plaintiff's medical history documents his ascending aortic aneurysm remaining stable and left ventricular function later becoming normal, without evidence of rapid enlargement prompting operative treatment. He was repeatedly described as asymptomatic and denied having cardiac symptoms in follow-up exams. Accordingly, the record supports the ALJ's finding that Plaintiff's cardiac impairment is not as limiting as alleged.

### vi.    Plaintiff's Allegations of Limiting Physical Impairments

While Plaintiff claims the step four physical limitations do not "accurately encompass all exertional and non-exertional limitations that are supported by the record," (Doc. 8 at 13), the dispositive inquiry is whether the ALJ legally erred or made a finding not supported by substantial evidence in the record, *Revels*, 874 F.3d at 654. Neither is the case here. The ALJ considered all symptoms before

formulating the "light work" residual functional capacity finding. AR 21–23. The ALJ proffered substantial evidence concerning the claimant's allegations regarding intensity, persistence, and limiting effects that were not entirely consistent with the administrative record. AR 21–23. The evaluation of the claimant's symptoms rested on two rationales: (1) improvement and healing with treatment across multiple impairments, and (2) the claimant's admitted physical activities were inconsistent with disabling limitations. AR 21–23; *see Smartt*, 53 F.4th at 500. The ALJ cited evidence of conservative management and postoperative improvement concerning each of the claimant's impairments. AR 22–23. The ALJ also relied on the claimant's own subjective reports, including that he moved heavy objects, engaged in yard work, used a hammer and other power tools for home improvement projects, and worked on vehicles, all of which contradicted the claimant's allegations of disabling pain and limitations. AR 21–23.

Because the ALJ's interpretation of the aforementioned evidence was rational, Plaintiff cannot obtain reversal by asking for a reweighing of evidence or the acceptance of Plaintiff's preferred characterization of his activities. *Reddick*, 157 F.3d at 720–21; *Burch v. Barnhart*, 400 F.3d 676, 680–81 (9th Cir. 2005). Having considered the claimant's subjective complaints, the ALJ was not required to catalog every limitation the claimant attached to those activities. *Smartt*, 53 F.4th at 500 n.3. The ALJ's finding is supported by substantial evidence.

27

## II.    Medical Source Opinions

In assessing disability, an ALJ may rely on the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). An ALJ considers factors such as (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors in evaluating a physician's medical opinion concerning a claimant's alleged disabilities. 20 C.F.R. § 404.1520c(c).

Plaintiff argues the ALJ failed to weigh the opinions of (1) State agency medical consultants, (2) Shanna Romero, and (3) Dr. Calle. These opinions are addressed in turn.

### A.    State Agency Medical Consultants

At the initial level, the State agency medical consultants assessed a reduced range of light work, including exertional limitations consistent with postural restrictions, such as frequent climbing of stairs, never climbing ladders, and frequently balancing, stooping, kneeling, crouching, and crawling. AR 86. The consultants also assessed upper-extremity limitations, noting limitations on reaching overhead with the left upper extremity. AR 87. Limitations on the right wrist were also noted, specifically in handling and fingering, with a ten-minute break in hand use every two hours, achieved through task rotation or regular

28

breaks.  AR 87.

On reconsideration, the State agency medical consultants again made a light work assessment, but reduced the postural and upper-extremity limitations.  AR 108–09.  Their findings reflect the functional limits accommodating the claimant's musculoskeletal complaints while recognizing documented improvement with mild to moderate medical findings.  AR 86–87, 108–09.

The ALJ found the State agency medical consultants' findings "generally persuasive" because they were "supported by a reasonable explanation after review of the medical record and the claimant's subjective reports" and "consistent with treatment course including reports, imaging, labs, surgical intervention, medication management, and the medical source opinions in the file from Shanna Romero and Ingrid Calle." AR 25.  Substantial evidence supports that conclusion, where postoperative recovery and continued functional progression through therapy and activity tolerance are observed with Plaintiff's shoulder impairment, right elbow, wrists, back, and heart.[1]  Accordingly, the ALJ gave appropriate weight to the

---

[1] *See* AR 505, 511, 513, 515–17, 593, 624, 626, 631, 633, 642, 655–66, 689–98, 722, 728, 822, 940–41, 944–45, 961–63, 990–97, 1002–07, 1023–24, 1028–29, 1039–41, 1051–52 (shoulder), 481, 484, 504, 649, 651, 657, 784, 787, 797, 1023 (right elbow), 509–10, 787–96, 804–09, 959, 1014, 1023, 1287–88, 1299 (bilateral wrists), 669–70, 706–11, 739–40, 828–30, 833–37, 846–63, 866–67, 875–90, 892–99, 907–08, 915–16, 925–28, 936–43, 966–78, 996–1001, 1023–24, 1051–57, 1063, 1100, 1271, 1286–87 (back), 433, 511, 1266–69, 1289, 1295, 1305, 1308, 1310–11, 1351–53, 1359 (heart).

29

opinion of State agency medical consultants.

**B.    Licensed Clinical Social Worker Shanna Romero**

Shanna Romero provided a Mental Residual Functional Capacity Statement indicating she treated Plaintiff on a bi-monthly basis beginning February 2022 and diagnosed him with post-traumatic stress disorder and major depressive disorder. AR 1262.  When asked to identify categories for Plaintiff's functional mental performance, Romero identified numerous limitations concerning "Sustained Concentration and Memory."  AR 1262–63.  Romero indicated these limitations were Category IV in severity, meaning they all precluded his work performance for 15 percent or more of an eight-hour workday, and cumulatively would preclude more than 30 percent of the workday.  AR 1262–63.

The ALJ found Romero's opinion unpersuasive because it "was not sufficiently supported," "offer[ed] little rationale or reference to [the] treatment record," and was "generally inconsistent with the level of treatment provided as well as the treatment reports and imaging that generally reflect mild to moderate findings."  AR 25.  That finding is grounded in the content of Romero's submission, with Romero replying to a question on whether Plaintiff had reduced intellectual functioning as "Unknown, further testing is advised to determine this information," and no clinical explanation tied to medical findings was provided in the space on the form for "Additional comments and remarks."  AR 1265.  The

30

consistency finding is also supported by the record, including evidence of largely intact mental functioning and Plaintiff's ability to perform tasks and interact appropriately with others. AR 24. Where the record supports no more than mild B criteria limitations, the ALJ found Romero's evaluation inconsistent with the administrative record. AR 24–25. Accordingly, the ALJ gave appropriate weight to Romero's opinion.

## C.    Doctor Ingrid Calle

Dr. Ingrid Calle submitted multiple opinions and statements addressing Plaintiff's physical functional capacity. AR 775, 812–15, 1257–61. In an early narrative, Dr. Calle indicated that he had been under her care since May 2021, and stated he was "being treated by [her]self for chronic back pain." AR 775. In a June 2023 Physical Medical Source Statement, Dr. Calle endorsed severe functional limitations, including sitting and standing tolerances of less than two hours in an eight-hour workday, the need to shift positions at will and take unscheduled breaks, and significant hand, finger, and arm use limits, along with the estimation Plaintiff would be off task 25 percent or more with absences exceeding four days per month. AR 812–15. In a February 2024 Physical Residual Functional Capacity Questionnaire, Dr. Calle again endorsed ongoing work-preclusive limitations, although recognizing Plaintiff is "[c]apable of low stress jobs." AR 1257–61.

31

The ALJ found Dr. Calle's opinion unpersuasive because it was "not sufficiently supported by a reasonable rationale or explanation for her findings" and "generally inconsistent with the level of treatment provided as well as treatment reports and imaging that generally reflect mild to moderate findings." AR 25.  Substantial evidence backs the ALJ's supportability concern, as the September 2022 letter, June 2023 statement, and February 2024 questionnaire provide little objective narrative explanation relating Dr. Calle's conclusions to specific clinical findings.  *See* AR 775, 812–15, 1257–61.  Substantial evidence also supports the ALJ's consistency finding, given that the administrative record reflects significant postoperative and rehabilitative improvement and evidence inconsistent with the most extreme limitations Dr. Calle proposed.  Accordingly, the ALJ gave appropriate weight to the opinion of Dr. Calle.

**D.    Conclusion**

The ALJ gave appropriate weight to the medical opinions in the administrative record.  AR 24–25.  The cited record supports the ALJ's core rationale that improvement with generally conservative treatment, in tandem with mild to moderate objective medical findings, undermined the most extreme functional limitations assessed by the treating sources, while supporting a restricted "light work" residual functional capacity finding.  AR 21–26.  Accordingly, Plaintiff's argument fails.

32

## III.    Vocational Expert

Plaintiff's challenge to the vocational expert testimony is derivative of his earlier discussed challenges to the legal validity of the ALJ's residual functional capacity findings and therefore must also fail.  Because the ALJ's residual functional capacity determination stands, Plaintiff cannot establish reversible error by recasting the same rejected limitations as a purported issue with the vocational expert's testimony.  *See Nadon v. Bisignano*, 145 F.4th 1133, 1138 (9th Cir. 2025) (rejecting a challenge to an ALJ's assessment of a vocational expert on the ground that the failure to incorporate certain limitations had already been discounted).

## IV.    Testimony of Plaintiff and His Father

Plaintiff argues the ALJ improperly rejected Plaintiff's subjective symptom testimony and the third-party statement provided by his father.  *See* AR 21–26.  Neither argument is persuasive.

### A. Plaintiff's Testimony

Where the claimant has produced "objective medical evidence establishing an impairment that could reasonably produce the symptoms of which []he complains, an adverse credibility finding must be based on clear and convincing reasons."[2]  *Smartt*, 53 F.4th at 497 (internal quotation marks omitted).  The ALJ

---

[2] The Commissioner's argument that the "specific, clear, and convincing reasons" standard conflicts with the "substantial evidence" standard prescribed in 42 U.S.C. § 405(g) is noted.  (*See* Doc. 14 at 19 n.1.)  Because the ALJ's decision satisfies

33

must do more than "recite[] boilerplate language." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.6 (9th Cir. 2017); *see Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) (explaining that while use of generic language is not itself reversible error, rejecting subjective symptom testimony requires "specific, clear, and convincing reasons for rejecting the claimant's testimony"). The decision must identify the testimony being discounted and relate that testimony to the evidence undermining it. *Brown-Hunter*, 806 F.3d at 493; *Treichler*, 775 F.3d at 1102. Concomitantly, review is deferential, and a "court may not substitute its judgment" for the Commissioner's where evidence is susceptible to more than one rational interpretation. *Reddick*, 157 F.3d at 720–21.

Here, the ALJ applied the proper standard, identifying the claimant's symptoms and providing clear and convincing reasons for rejecting them. AR 21; *see* 20 C.F.R. § 404.1529; SSR 16-3p. The ALJ found the claimant has numerous medically determinable impairments, relevant here, the shoulder, right elbow, wrists, back, and cardiac impairments previously discussed, that could reasonably be expected to cause his alleged symptoms. AR 21–22. The sole question is whether the ALJ provided "specific, clear, and convincing reasons" for his determination that the claimant's statements about the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent" with the record.

_____

the higher standard, the issue need not be reached.

34

AR 22–26; *Smartt*, 53 F.4th at 499 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." (internal quotation marks omitted)).  Because the ALJ's residual functional capacity finding is supported by the record, the question is not whether the claimant's testimony could support a more restrictive step four assessment, but whether the ALJ discounted those portions of the claimant's symptom testimony conflicting with the residual functional capacity finding.  The ALJ did.

The ALJ summarized the claimant's allegations, AR 21, and provided a record-based explanation for why the claimant's alleged degree of limitation was not borne out over time.  *See* AR 21–24; *Brown-Hunter*, 806 F.3d at 493; *Treichler*, 775 F.3d at 1102.  Plaintiff claims severe limitations based on pain and lack of function, and the ALJ considered those allegations for supportability prior to evaluating consistency with the objective record.  AR 21–24.  The ALJ then identified a rationale, that is, improvement with treatment and increased functional gains supported by repeated examples across the record.  AR 21–24; *Smartt*, 53 F.4th at 499 (explaining that an ALJ is only prohibited from "render[ing] a claimant's subjective symptom testimony superfluous by demanding positive objective medical evidence 'fully corroborat[ing]' every allegation within the subjective testimony").  The ALJ did not declare disbelief in the claimant's testimony but pointed to post-treatment functional findings and improvement

undermining his allegations of disabling severity and persistence of symptoms.

The ALJ also relied on the claimant's reported activity levels as being inconsistent with his allegations. AR 23; *Smartt*, 53 F.4th at 499–500; *Burch*, 400 F.3d at 680–81; *Reddick*, 157 F.3d at 722. The ALJ's decision specified that the claimant "reported that he was able [t]o do various physical activities, including working [on] vehicles, mowing and yard work" and that he was working a few hours a day and landscaping. AR 23. The record corroborates that he engaged in physically demanding activities during the relevant period, which supports the ALJ's finding that he was not as functionally limited as alleged. AR 22–24.

The ALJ's finding also does not run afoul of the rule that the claimant's testimony may not be rejected solely on the basis that it is not fully corroborated by objective medical evidence. *Burch*, 400 F.3d at 680. The ALJ's rationale was not limited to the absence of corroboration; instead, the rationale rested on evidence reflecting improvement of symptoms with treatment and activity by the claimant that was inconsistent with the alleged degree of functional limitation. AR 22–24; *Smartt*, 53 F.4th at 499–500. Because those rationales are supported by substantial evidence, the ALJ's evaluation of the intensity, persistence, and limiting effects of the claimant's symptoms satisfies the Ninth Circuit's "specific, clear, and convincing reasons" articulation requirement. AR 21–24; *Smartt*, 53 F.4th at 497 (internal quotation marks omitted); *Burch*, 400 F.3d at 680–81.

## B. Plaintiff's Father's Testimony

Plaintiff's father submitted a September 2021 third-party function report describing Plaintiff's post-surgical limitations and daily functioning, which included temporary limitations in Plaintiff's left arm due to a sling. AR 330–37. He reported that Plaintiff could perform "[s]imple household chores," check in on his 94-year-old grandfather every day, prepare meals, clean, do laundry and dishes, shop for household items, interact with others, and go outside daily. AR 331–33. The ALJ considered "in its entirety" the claimant's father's written assessment and found the testimony "generally consistent with the claimant's reports." AR 25–26. The Commissioner argues that no additional articulation was required for this nonmedical-source statement. (*See* Doc. 14 at 15 (citing *Hudnall v. Dudek*, 2025 WL 1379101, at **4–6 (9th Cir. May 13, 2025) (Bumatay, J., concurring)). But even if the ALJ's analysis on this front is deficient, any such error is harmless because "the lay testimony described the same limitations as the [the claimant's] own testimony, and the ALJ's reasons for rejecting [the claimant's] testimony apply with equal force to the lay testimony." *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012). Accordingly, Plaintiff's father's statement provides no basis for remand.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Plaintiff's request for

remand, (Doc. 1), is DENIED.  The Commissioner's decision is AFFIRMED.  The

Clerk of Court is directed to enter judgment consistent with this Order.

DATED this 23ʳᵈ day of April 2026.

14:37 P.M

Donald W. Molloy, District Judge
United States District Court